

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00113-CV

_____

IN THE INTEREST OF E.J., B.J., K.C., AND K.C., CHILDREN

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-714221-22

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

## I.  INTRODUCTION

After a bench trial, the trial court terminated B.C.'s (Father's) parental rights to his son, Bobby.[1]  The trial court also terminated Mother's parental rights to Bobby and to her other children, Emma, Kathy, and Kendra.  Kathy and Kendra's father (J.C.) and Emma's unknown father had their parental rights terminated as well.

Father appeals the decision against him, raising six issues:  (1) the evidence is legally and factually insufficient to support the finding that Father placed or allowed Bobby to remain in conditions that endangered Bobby's physical or emotional well-being, (2) the evidence is legally and factually insufficient to support the finding that Father engaged in conduct that endangered Bobby's physical and emotional well-being, (3) the evidence is legally and factually insufficient to support the finding that Father constructively abandoned Bobby, (4) the trial court erred by admitting evidence of Father's prior criminal history, (5) the evidence is legally and factually insufficient to support the finding that terminating Father's parental rights was in Bobby's best interest, and (6) the trial court violated Father's due process rights.

Mother's court-appointed appellate counsel and J.C.'s court-appointed appellate counsel have each filed *Anders*[2] briefs concluding that the appeals are

---

[1]We use aliases for Bobby and his siblings throughout this opinion.  *See* Tex. R. App. P. 9.8(b)(2).

[2]*Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967).

frivolous and without merit.  Because we find no arguable issues to support Mother's and J.C.'s appeals, we affirm the trial court's judgment as to them.

We overrule Father's challenge to the trial court's endangerment-by-conduct finding which is supported by legally and factually sufficient evidence.  Having overruled Father's second issue, addressing his first and third issues is not necessary. *See* Tex. R. App. P. 47.1.  We also overrule Father's fifth issue because legally and factually sufficient evidence supports the trial court's best-interest finding.  Finally, we overrule Father's evidentiary and due process issues.  Therefore, we affirm the trial court's judgment.

## II.  BACKGROUND

Mother has four children, all of whom are the subject of the present parental termination suit.  Bobby, at age five, is the second-oldest.  Bobby's sister Emma is a little over a year older than him.  There are also twins, Kathy and Kendra, who were born in January 2022.  Father thought he was Emma's father.  DNA testing showed, however, that Father's only child with Mother is Bobby.  The twins' father is J.C.

Mother has a drug problem and admitted that her "major situation has always been marijuana."  She consistently tested positive for cocaine during the months after the children's removal.  Mother said that she medicates with marijuana instead of prescription medication to alleviate her depression.  Bobby tested positive for marijuana at birth in 2017.

When they were two months old, in March of 2022, the twins were admitted to the hospital for failure to thrive because they were still at their birth weight.[3] An investigator with the Department of Family and Protective Services, Autumn Edwards, visited Mother and tried to discuss the situation with her. Mother denied that there was anything wrong with her (though she said she may have had postpartum depression) and said she had no time for therapy. Edwards also spoke to J.C., but he demonstrated such "erratic behavior" that Edwards felt unsafe and left his home. J.C. made clear that he had no concern about the twins' failure to thrive. Edwards also discovered that J.C. was a registered sex offender. Causing Edwards further worry was the fact that neither parent could tell the twins apart.

The Department requested that the children be removed, but they were allowed to discharge from the hospital to their parents, provided certain conditions were met. The parents were required to follow a regular feeding schedule and to take the babies to regular medical appointments. The twins still failed to gain weight, however, so they were placed in foster care.

Mother and J.C. also had to submit to drug-testing. After they both failed drug tests in May 2022, another Department investigator—Destiny Wiles—tried to make contact with the parents. After she was unable to, she visited Emma at her school. It was clear to Wiles that Emma was developmentally delayed. When Wiles later spoke

---

[3]The foster parent testified that Emma and Bobby "ate like [they were] never going to see food again."

4

to both parents, Mother seemed unconcerned about J.C.'s sexual abuse history.  J.C. admitted to having used cocaine on a weekly basis.  Wiles obtained an order removing both Emma and Bobby although she had not yet been able to see or speak with Bobby.

On the day Emma was removed, Wiles's supervisor saw Bobby walking on a sidewalk with a woman who might have been Mother's sister.[4]  Bobby was barefoot on a 90-degree day on a concrete sidewalk, and he was "filthy."  Investigators eventually changed Bobby's clothes because they smelled strongly of urine.  He also had a large knot on his forehead.  Bobby was diagnosed with PTSD and oppositional disorder.

Both children were taken to the hospital for evaluation.  They had marks and scars on their lower backs and buttocks.  Some of these marks were photographed and admitted at trial.  The source of the marks was evidently physical abuse.  Mother told Wiles that J.C. was in the habit of hitting the children with both his hand and belt.

Bobby had what his caseworker described as a "very abnormal" level of aggression for a five-year-old, aggression which included hitting people, kicking them, and throwing furniture.  Mother, for her part, seemed unconcerned with Bobby's

---

[4]Mother's sister denied that they had been walking down the street.  She claimed that Bobby had been inside her home, watching television, when "the CPS lady" came.

aggression, believing it to be normal. Bobby had to be evaluated multiple times at the hospital for his behavior. His medical records indicated diagnoses for "expressive language delay" and "speech and language deficits."

At this time, Father was in jail, awaiting trial on charges of murder and aggravated assault. Reba Shaffer, caseworker with Our Community Our Kids, was assigned to work with the family. She mailed Father a copy of the family service plan but did not hear back from him. Shaffer visited Father in jail a couple of times. She explained to him that, because of his incarceration, he would be limited in what he could accomplish under the service plan. She also told Father that her biggest concern was getting him to provide information about relatives or friends who could be possible placements for the children. During his time in jail, Father did not try to communicate (via card or letter) with Bobby nor did he express to Shaffer any interest in Bobby.

All four siblings are in the same foster home. The foster parents intend to adopt the children together. Bobby and his sisters are thriving in the foster home and he regularly receives behavioral and play therapy. The foster parents have set consistent rules that Bobby is expected to live by, and his behavior has improved as a result.

Father attended the termination trial and was called by the Department to testify. He exercised his right not to testify, however. Shaffer, Bobby's caseworker,

testified that termination of Father's parental rights to Bobby would be in his best interest. According to Shaffer,

> [Father has] been in and out of jail, had multiple incarcerations, has not been there for [Bobby], does not really have a relationship with [Bobby], and currently is in jail and unable to provide or take care of him in any way. He also has not provided a solid plan for someone else to take care of him.

The trial court terminated Mother's rights to all the children, J.C.'s rights to the twins, the unknown father's rights to Emma, and Father's rights to Bobby. The trial court found that Father had engaged in endangering conduct, had allowed Bobby to remain in an endangering environment, had constructively abandoned Bobby, and that terminating his parental rights would be in Bobby's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (2).

## III. LEGAL AND FACTUAL SUFFICIENCY OF ENDANGERMENT

In his first and second issues, Father claims that there was legally and factually insufficient evidence to support the trial court's endangerment findings under Sections 161.001(b)(1)(D) and (E) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We disagree with Father.

### A. LEGAL AND FACTUAL SUFFICIENCY STANDARDS OF REVIEW

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d

7

796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We give deference to the factfinder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the factfinder resolved any disputed facts in favor of its findings, so long as a reasonable factfinder could do so. *Id.* We disregard any evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but we do not disregard undisputed facts. *Id.*

In evaluating the evidence's factual sufficiency to support termination, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If the factfinder reasonably could form a firm conviction or belief that termination is justified under the relevant subsections, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). But if a factfinder reasonably could not—

8

because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. ENDANGERMENT UNDER SUBSECTION (E)

The trial court granted the termination in part on the grounds listed in Subsections (D) and (E) of Section 161.001(b)(1). If a trial court's termination is based on (D) or (E), an appellate court must review one of those grounds (or both if neither withstands appellate review) when raised on appeal—even if other grounds would support termination—because a termination on either of those grounds has collateral consequences for the parent's relationship with other children the parent may have in the future. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis."); *In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *1 n.3 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) ("We read *N.G.* to say that an affirmance under either (D) *or* (E) suffices because under (M) an affirmance under one makes the other moot."). We begin with ground (E).

The conduct-endangerment ground permits termination (assuming termination is in the child's best interest) when the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E).

9

"Endanger" in this context means "to expose to loss or injury, to jeopardize." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) and *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

The relevant inquiry under (E) is "whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *M.B.*, 2015 WL 4380868, at *12. Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at *12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department. *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *M.B.*, 2015 WL 4380868, at *12.

A parent's criminal history—whether it entails conduct, convictions, or imprisonment—is relevant to the question of whether he engaged in an endangering

10

course of conduct. *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Routinely subjecting a child to the probability that the child will be left alone because a parent is in jail endangers the child's physical and emotional well-being. *In re S.L.-E.A.*, No. 02-12-00482-CV, 2013 WL 1149512, at *8 (Tex. App.—Fort Worth March 21, 2013, pet. denied.); *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

## C. ANALYSIS

Father has an extensive criminal history. At trial, the Department presented the following evidence:

- Father was convicted of failure to identify as a fugitive and providing false information in 2005 and sentenced to 180 days in jail.

- Father was convicted of assault causing bodily injury of a family member in 2010 and sentenced to forty days in jail.

- Father was convicted of burglary of a habitation in 2011 and sentenced to five years in prison.

- Father was convicted of possession of marijuana in 2017 and sentenced to eighteen days in jail.

- Father was convicted of assault causing bodily injury of a family member in 2019 and sentenced to 60 days in jail.

- As of the date of trial, Father was in jail under indictments for murder and aggravated assault with a deadly weapon (alleged to have been committed in 2020).

11

While Father was in the Tarrant County Jail awaiting trial on his murder and aggravated assault charges, Shaffer mailed him a copy of the court-ordered family service plan but never heard anything from him. She visited him in jail in person, explained the plan to him, and told him there were limitations on what he could do while he was in jail. Shaffer told Father that she needed him to provide names of relatives who could provide a temporary home for Bobby. Father mentioned that his current wife might be available, but he did not give Shaffer any information about her. He also put forward the name of an ex-mother-in-law, but she told Shaffer that she was not interested in raising Bobby because she was already raising a child of Father's who was around Bobby's age. However, she noted that if anything changed with Bobby's foster placement, she would "step up to support him."

Shaffer met with Father in person a few times during the case, but Father never asked how Bobby was doing. He had no questions about the children and had trouble conversing with Shaffer about anything. Father also did not send a card or letter to either Bobby or Emma (when he thought that he might have been her father). Shaffer testified that Father never expressed any interest in Bobby or his well-being.

Father refused to testify based on his constitutional Fifth Amendment right. When a litigant chooses to invoke his right in civil matters, certain inferences may be drawn. *In re B.B.*, Nos. 02-19-00250-CV, 02-19-00251-CV, 2020 WL 1057308, at *2 (Tex. App.—Fort Worth Mar. 5, 2020, no pet.); *In re C.J.F.*, 134 S.W.3d 343, 352–53

12

(Tex. App.—Amarillo 2003, pet. denied) ("Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances").  The attorney for the Department asked Father if he committed the murder and aggravated assault that he is currently under indictment for, asked about his extensive criminal and incarceration history, asked whether some of his children are currently being raised by others (including his ex-mother-in-law), and asked him if it was true that he has not provided for or communicated with his child during the case's pendency.  Father, of course, did not respond.  The finder of fact could therefore infer that Father is indeed guilty of the crimes for which he has been accused, that evidence presented of his criminal history is accurate, and that he has shown no interest in contacting his child. *See C.J.F.*, 134 S.W.3d at 352–53.

Under these facts, Father's history of incarceration forms an important part of a course of conduct endangering Bobby. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).  Father's long periods of incarceration expose Bobby to the risk of leaving him without a caregiver and exposing him to instability and insecurity. *See In re J.B.*, No. 02-22-384-CV, 2023 WL 1859766 at, *9 (Tex. App.—Fort Worth February 9, 2023, pet. denied).  In addition, under Subsection (E), charges themselves can be relevant—they do not necessarily have to have resulted in convictions. *Id.*  And Father's pending murder and aggravated assault charges are especially relevant in this case, where the factfinder could reasonably infer the truth of

13

the allegations. At the time of trial, Father had been incarcerated for all of Bobby's short life, and there is no reason to think that he will be able to parent Bobby from prison in the future.

Given Father's extensive history of incarceration and viewed in the light most favorable to its endangerment-by-conduct finding, we hold that a reasonable factfinder could form a firm belief or conviction that the finding is true. We also conclude, having performed an exacting review of the entire record, that the evidence is factually sufficient to support the trial court's endangerment-by-conduct finding. *See A.B.*, 437 S.W.3d at 507. We overrule Father's first issue.[5]

## IV. BEST INTEREST

In Father's fifth issue, he attacks the legal and factual sufficiency of the evidence supporting the trial court's finding that termination was in Bobby's best interest.

### A. LAW

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is

---

[5]Because we have affirmed the sufficiency of the evidence to support the (E) ground, we need not address the (D) or (N) grounds. *See In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755 at, *5 (Tex. App.—Fort Worth April 30, 2020, no pet.); *In re D.D.G.*, 423 S.W.3d 468, 475 (Tex. App.—Fort Worth 2014, no pet.).

sufficient to support a best interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities and conduct indicating an improper parent-child relationship;

- the programs available to assist these individuals to promote the child's best interest;

- the parent's plans for the child and the stability of the home or proposed placement; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other

hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## B. DISCUSSION

### 1. Child's desires

Bobby was just over five-years-old at the time of trial. There was no evidence at trial concerning Bobby's desires regarding Father. Therefore, this factor is neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) ("[T]he first *Holley* factor is neutral because no evidence of the children's desires was presented.").

### 2. Child's Emotional and Physical Needs and Danger to the Child Now and in the Future

Children need long-term safety and stability. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied). Father poses a danger to Bobby because of his seeming inability to stay out of jail.

As already discussed, Father has an extensive history of criminal acts and incarceration. From a parent's past misconduct, a factfinder may infer a parent's

future conduct. *See A.S.*, 394 S.W.3d at 714 ("[E]vidence of past misconduct or neglect is permissible as an inference that a parent's future conduct may be measured by their past conduct.").

Father's constant incarceration can do nothing but lend more instability to Bobby's life. The trial court could infer that Father would be convicted of his pending murder and aggravated assault cases,[6] and would serve an even longer sentence in prison as a result. Further, there is no evidence that, even if Father were not sentenced for his pending charges, he would avoid committing crimes and going to prison in the future. Father, despite his presence in court, refused to answer any questions at all; therefore, the trial court could reasonably presume that he had no future plans for Bobby.

### 3. Plans for the Child of the Individuals Seeking Custody and Programs Available to Help the Child

Bobby is comfortable in his foster parents' home. Though he still has behavioral issues, the foster parents have been very consistent with him. He has progressed to a point that he understands right from wrong, which appears to flow from the foster parents' appropriate implementation of clear rules.

Bobby's foster parents are willing to adopt him and his three siblings, thus providing him the stability that Father seems unwilling and unable to provide.

---

[6]As previously discussed, the trial court was entitled to infer from Father's refusal to answer questions about his pending charges that he was indeed guilty of the accused crimes.

17

According to the foster father, he and his wife "will do anything for those children." In addition to being willing to adopt Bobby, the foster parents have made sure that Bobby receives play therapy and behavioral therapy.

By contrast, there is no evidence of any bonding between Father and Bobby— Father showed no interest during the pendency of the case in even contacting Bobby. Nor is there any evidence that Father desires to bond with Bobby in the future, should he be released from jail.

### 4.  Programs Available to Assist These Individuals to Promote the Child's Best Interest

Bobby, who has been diagnosed with PTSD and oppositional disorder, currently receives both play and behavioral therapy.  The foster parents intend to continue with this therapy in the future.

### 5.  Father's Excuses

There was no evidence at trial regarding any excuses or explanations for Father's history (and probable future) of incarceration.  *See Holley*, 544 S.W.2d at 372 (listing "any excuse for the acts or omissions of the parent" as best-interest factor). On appeal, Father admits that repeated criminal acts and continued incarceration can negatively impact a child's living environment and emotional well-being, but he argues that "the mere facts of his criminal history and current pending charges" do not justify termination.  What Father has not explained either at trial or on appeal is how his continued incarceration can provide stability to Bobby in the future.

## 6. Holding

Bobby is currently with his siblings in a stable, adoption-motivated foster home. He has shown improvement in that placement and has bonded with his foster parents. The home is safe and appropriate, and his foster parents are able and willing to meet Bobby's needs. Father, on the other hand, cannot show that he can provide any stability to Bobby's life, now or in the future.

We hold that the evidence is legally and factually sufficient to show that terminating Father's parental rights was in Bobby's best interest. We overrule Father's fifth issue.

## V. OBJECTIONS TO EVIDENCE OF PRIOR CRIMINAL HISTORY

In Father's fourth issue, he challenges the trial court's decision to admit evidence of his criminal history (including his current indictments) over his objections that admission of this evidence violated evidence rules 404(b) and 406. *See* Tex. R. Evid. 404(b), 406. The Department responds that the trial court did not abuse its discretion by overruling Father's objections. We agree with the Department.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d at 575. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *In re D.D.*, No. 02-17-00368-CV, 2018 WL 1630708, at *12 (Tex. App.— Fort Worth Apr. 5, 2018, no pet.) (per curiam) (mem. op.) We may not declare a trial

19

court's ruling to be an abuse of discretion simply because we would have reached a different conclusion. *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004).

Rule 404(b) generally allows admission of other crimes, wrongs, or acts if the evidence has relevance apart from character conformity. Tex. R. Evid. 404(b). Rule 406 permits evidence of a person's "habit" or "routine practice" to prove that on a particular occasion he acted in accordance with that habit or routine practice. Tex. R. Evid. 406.

As detailed above, Father has an extensive criminal and incarceration history dating back to 2005. At the time of trial, he was in jail awaiting trial for both murder and aggravated assault charges. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if the fact "is of consequence in determining the action." Tex. R. Evid. 401. Father's criminal history is relevant, therefore, if it makes it more or less likely that he endangered Bobby and that termination was in Bobby's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.R.*, No. 02-15-00394-CV, 2016 WL 1267937, at *6 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.). A parent's criminal history is "directly relevant to the best-interest determination." *J.B.*, 2018 WL 3289612, at *7 (rejecting challenge to criminal history as irrelevant in termination case). Stability is also in a child's best interest. *See M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *19 (Tex. App.—Fort Worth June 28, 2021, pet. denied). In addition, evidence of

prior criminal behavior is probative as to whether a parent engaged in a course of conduct that endangered the child. *J.T.G.*, 121 S.W.3d at 133.

In this case, Father's continued incarceration has removed him from Bobby's life and will jeopardize Father's future ability to provide a stable home to Bobby. *See J.B.*, 2018 WL 3289612, at *7 (holding evidence of father's "extensive" criminal history was "directly relevant both to his absence from [the child's] life and to his failure to financially and emotionally support him"). As to Father's 404(b) objection, the Department did not introduce evidence of his prior convictions to prove conduct conformity—instead, it was probative on the issue of whether he engaged in a course of conduct that endangered Bobby and was relevant to whether his continued parenting of Bobby would be in Bobby's best interest. *See J.T.G.*, 121 S.W.3d at 133. Father's argument that the Department failed to show that his prior convictions constituted a "habit" under Rule 406 is similarly unavailing: the Department did not offer his convictions to prove that he behaves in accordance with the habit or routine practice of being incarcerated for criminal conduct. *See id.* (holding parent's complaint that his prior criminal history was inadmissible under impeachment rule failed where prior history was not offered to impeach his credibility).

Father further argues that evidence of his past is irrelevant because most of the offenses (including his recent murder indictment) "predate the children's birth by a couple of years." Father appears to have misidentified his child. Bobby was born in 2017—Father was convicted of assault causing bodily injury in that year, and his

21

murder and aggravated assault indictments allege that the offenses were committed in 2020. If Father committed murder subsequent to Bobby's birth, that would certainly be relevant to Father's ability to parent him (and whether termination would be in Bobby's best interest). In any event, however, even criminal conduct that occured prior to Bobby's birth is relevant to Father's ability to meet Bobby's physical and emotional needs. *See D.M.*, 58 S.W.3d at 814.

The trial court did not abuse its discretion by admitting evidence of Father's criminal history and record of incarceration. We overrule Father's fourth issue.

## VI. DUE PROCESS

In his sixth issue, Father claims that his due process rights were violated because he was unable to complete family services while incarcerated. We overrule Father's due process claim because he has failed to preserve it. *See* Tex. R. App. P. 33.1. Father did not object that he was denied due process with regard to his inability to complete services, he did not file any pretrial motions complaining that he had been denied due process, and he did not raise a due process claim in a motion for new trial. *See In re A.J.*, No. 02-22-00141-CV, 2022 WL 3701179, at *1 and n.3 (Tex. App.—Fort Worth Aug. 26, 2022, no pet.) ("Father complains that his due-process rights were violated because he did not receive any services from DFPS, but he did not raise or receive a ruling on this issue at trial.").

Even if Father had preserved his due process claim, it would still be meritless. His argument is not entirely clear, but Father appears to claim that he was not allowed

22

to complete services until he could be released from jail (which, at the time of trial, did not happen). But waiting for a release that may never occur is simply not an option because Father's due process concerns do not require that his son "languish[ ] indefinitely in foster care." *In re L.C.C.*, 667 S.W.3d 510, 517 (Tex. App.—Eastland 2023, pet. denied).

We overrule Father's sixth issue.

## VII. *ANDERS* BRIEFS

Appointed counsel for Mother and appointed counsel for J.C. have each filed briefs asserting that their appeals are frivolous. They have presented a professional evaluation of the record and demonstrated why there are no arguable grounds on which to advance an appeal. *See In re K.W.*, No. 02-23-00082-CV, 2023 WL 4289613, at *1 (Tex. App.—Fort Worth June 30, 2023, no pet.) (mem. op.). We provided Mother and J.C. the opportunity to obtain a copy of the appellate record and file a pro se response, but neither has done so. The Department has not responded to the *Anders* briefs.

When an *Anders* brief is filed, we must independently examine the appellate record to determine if any arguable grounds for appeal exist. *In re C.J.*, No. 02-18-00219-CV, 2018 WL 4496240, at *1 (Tex. App.—Fort Worth Sept. 20, 2018, no pet.) (mem. op.). We also consider the Anders brief itself and—if filed—any pro se response. *In re K.M.*, No. 02-18-00073-CV, 2018 WL 3288591, at *10 (Tex. App.—Fort Worth July 5, 2018, pet. denied) (mem. op.).

Having reviewed the *Anders* briefs filed by Mother's and J.C.'s appointed counsel and the appellate record, we agree with counsel that Mother's appeal and J.C.'s appeal are without merit. *In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied).

## VIII. CONCLUSION

Finding no arguable issues to support Mother's and J.C.'s appeals, and having overruled Father's issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered: October 5, 2023